IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2012 Session

**IN RE KALEB N. F.**

**AMANDA KAY D. N. AND WAYLON RAY N.**
**v.**
**CHRISTY SHANTAE C. AND MICHAEL L.**

**An Appeal from the Chancery Court for Sumner County**
**No. 2009A-40     Tom. E. Gray, Chancellor**

_____

**No. M2012-00881-COA-R3-PT - Filed March 12, 2013**

_____

This appeal involves the termination of parental rights and adoption. In August 2007, the Department of Children's Services visited the home of the respondent mother and her 11-month-old son based on a referral. After it determined that the mother's husband had engaged in domestic abuse and that the mother was using illegal drugs, the Department told the mother that her son would be taken into state custody if she did not immediately find someone to care for him. The mother's neighbor, the petitioner in this case, agreed to take temporary custody of the mother's son. Even though the child was not actually taken into state custody, but was "safety-placed" with the petitioner neighbor, the Department developed a Family Services Plan, assigning certain tasks to the mother for her to regain custody of her son. After about ten months, before the mother had completed the assigned tasks, the Department closed the mother's case and ceased any involvement with the child or the mother. The child remained in the custody of the petitioner neighbor and her husband, and the mother visited the child each week. The mother brought the child items such as diapers, milk, and food, but made no monetary payments to the neighbor. When the child was three years old, the petitioner and her husband filed this petition to terminate the mother's parental rights and adopt the child. After a trial, the trial court terminated the mother's parental rights based on failure to comply with the Family Services Plan and failure to support. The mother now appeals. We reverse the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is**
**Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Joseph Y. Longmire, Jr., Hendersonville, Tennessee, for the Respondent/Appellant, Christy Shantae C.

C. Jay Ingrum, Gallatin, Tennessee, and Thomas F. Bloom, Nashville, Tennessee, for the Petitioners/Appellees, Amanda Kay D. N. and Waylon Ray N.[1]

## OPINION

In September 2006, Respondent/Appellant Christy Shantae C. ("Mother") gave birth to the child involved in this petition, Kaleb N. F. ("Kaleb" or "the child"). Mother was never married to the child's father, Respondent Michael L. ("Father"). Kaleb lived with Mother, her husband Charles M. ("Stepfather"), and Mother's daughter from a previous relationship, "Paige" W. ("Paige"), born in 1998.

### DCS Involvement

On August 9, 2007, when Kaleb was 11 months old, the State of Tennessee Department of Children's Services ("DCS") went to Mother's home based on a referral indicating drug abuse, environmental neglect, and physical domestic violence against Mother by Stepfather. DCS worker Alysha Pogue ("Ms. Pogue") was assigned to investigate the matter. During the visit, Mother admitted to Ms. Pogue that if a drug test were administered to her at that time, she would not be able to pass it. A drug test was administered to Mother and, consistent with her admission, she tested positive for amphetamines, THC, cocaine, methamphetamine, and Benzodiazapines. In the interview, Mother told Ms. Pogue that she and Stepfather got married only nine days prior to the incident that prompted the referral. She said that there had been prior physical altercations between them in the presence of the children, including incidents in which Stepfather threw Mother into a wall in front of the children.

Based on this information, Ms. Pogue informed Mother that the children would have to be removed from her custody pending a full DCS investigation. Ms. Pogue indicated that, if Mother could not immediately find someone to care for the children, they would be put into State protective custody. Hearing this, Mother became hostile, and the police were called. Eventually, Mother contacted Paige's father, who took Paige into his custody. However, Mother did not have a family member who could take immediate custody of infant Kaleb.

---

[1]Mr. Bloom did not represent the Appellees in the trial court proceedings.

Petitioner/Appellee Amanda Kay D. (now N.) ("Foster Mother"), a single, 20-year-old neighbor with whom Mother was acquainted, happened to be nearby at the time. Mother asked her to take immediate custody of Kaleb pending the DCS investigation, and she agreed. DCS accepted the verbal agreement between Mother and Foster Mother, so Foster Mother was permitted to take temporary custody of Kaleb.

At the time Kaleb was placed with Foster Mother, DCS had Mother sign an Immediate Protection Agreement ("IPA"). The IPA indicated that the "immediate harm factor" in the case was Mother's "drug use." Under the IPA, Mother agreed to submit to random drug screens, undergo drug and alcohol assessment and counseling, and follow all recommendations. DCS indicated in the IPA that Kaleb was "safety-placed" with Foster Mother, and that Foster Mother would supervise contact between Mother and Kaleb. The IPA noted generally that DCS would follow up in the case, but it did not specify how DCS would monitor or verify Mother's compliance with the requirements. Soon after she signed the IPA, Mother was taken to the hospital as a suicide risk; she stayed there for seven to ten days.

On August 20, 2007, after Mother was released from the hospital, she signed a second IPA ("IPA2"). In contrast to the first IPA, the IPA2 indicated that the "immediate harm factor" in the case was "domestic violence." The IPA2 required Mother and Stepfather to undergo a parenting assessment, complete anger management and domestic violence classes, and follow all recommendations. The IPA2 prohibited Stepfather from having contact with either Paige or Kaleb. It did not address visitation for Mother. However, at the time Mother signed the IPA2, Mother and Foster Mother had worked out a visitation schedule for Mother to see Kaleb.

On August 29, 2007, Mother was charged with driving while intoxicated ("DUI"), her second offense. At the time, it was anticipated that Mother might be required to spend time in jail or at an in-patient treatment facility for this charge. The hearing on the DUI charge was scheduled for February 2008.

Around this time, DCS assigned a Family Services Worker ("FSW"), Phyllis Andrews ("Ms. Andrews"), to supervise Mother's case. DCS personnel, mostly Ms. Andrews, recorded the progress in Mother's case in "case recording summaries" or just "case summaries." These case summaries were later introduced into evidence at the trial in this cause, and they provide some of the factual background.

According to Ms. Andrews and the case summaries, DCS developed a Family Services Plan (also called a "Service Plan") for Mother, setting out requirements that she would need to complete in order to regain custody of Kaleb. The Family Services Plan requirements were

purportedly similar to the requirements set forth in the IPAs. The appellate record, however, does not contain a Family Services Plan, and no such plan was submitted into evidence at the trial in this cause.[2]

Sometime after the IPA 2 was signed, Ms. Andrews visited Mother at her home. Ms. Andrews told Mother that she would need to complete certain tasks to regain custody of Kaleb. In this visit, Mother admitted to Ms. Andrews that she had smoked marijuana and had been taking illegal drugs. Ms. Andrews responded by recommending to Mother that she enter a treatment program as soon as possible.

Pursuant to Ms. Andrews' recommendation, Mother entered an alcohol and drug treatment program at Bradford Health Services. In the program, she received in-patient treatment for 14 days, followed by 45 days of out-patient treatment.

On October 31, 2007, Ms. Andrews again met with Mother to discuss the tasks required of Mother in order to be reunited with Kaleb. At that meeting, Mother signed a third IPA ("IPA3"), intended to clarify Mother's responsibilities. Like the IPA2, the IPA3 stated that the "immediate harm factor" in the case was "domestic violence." To address this, the IPA3 stated that Mother and Stepfather were required to complete anger management classes and parenting classes, and the family was required to have reunification counseling through Family Social Services ("FSS"). The expected completion date for the tasks was November 30, 2007. The IPA3 noted that Mother had "completed an [alcohol and drug] assessment," an apparent reference to her stint at Bradford Health Services.

By December 20, 2007, Mother had completed some, but not all, of the tasks discussed at the October 31, 2007 meeting. In light of this, the anticipated reunification was postponed until January or February 2008.

In January 2008, Mother and Stepfather moved into a home owned by a friend, Ronald Bullard. Mr. Bullard permitted them to live in the home without paying rent; in exchange, Mother and Stepfather were expected to make improvements to the home.

On January 14, 2008, Ms. Andrews met with Mother and Stepfather at their home. The case summary describing the meeting states that Mother and Stepfather had made renovations to the home in preparation for the children's return. Mother and Stepfather were scheduled to begin parenting classes that week, and Ms. Andrews indicated that she was considering lifting the restrictions on their visitation if they attended the classes as planned. At the time,

---

[2]As discussed below in this Opinion, DCS claimed that the Family Services Plan for Mother was "lost" prior to the trial.

it was anticipated that the couple would complete the parenting classes by the first part of February 2008.

In the case summary dated January 29, 2008, Ms. Andrews reported that Kaleb was doing well in the care of Foster Mother. The case summary indicated that Mother had been visiting Kaleb once every week, and that she sometimes took him on unsupervised visits to the home of the child's maternal grandparents. Ms. Andrews noted on that date that Mother "provides for Kaleb when she can usually [providing] diapers, wipes and milk; sometimes food." Foster Mother told Ms. Andrews that "Kaleb knows his mother and is always wanting to be hugged and loved on by her. . . . [H]e is overactive at times, but never appears to be sad or confused." Foster Mother said to Ms. Andrews that she and her fiancé, Petitioner/Appellee Waylon Ray N. ("Foster Father"), would keep Kaleb "as long as they need to."

In February 2008, the plans for family reunification went off track. In early February, Mother and Stepfather had a physical altercation. On February 10, 2008, Mother and Stepfather came to Foster Mother's home to pick up Kaleb for an unsupervised visit. When they arrived, Foster Mother noticed that Mother and Stepfather both "had black eyes." Mother asked Foster Mother not to report their apparent injuries to Ms. Andrews. Later, Foster Mother reported what she had seen to Ms. Andrews and told her that she thought that Mother and Stepfather should no longer be permitted to have unsupervised visits with Kaleb. Ms. Andrews did not discuss the matter with Mother. After receiving Foster Mother's report, however, Ms. Andrews prohibited Stepfather from having any contact with Kaleb; she required Mother's visits to be supervised, and they were to take place only at Foster Mother's house. Ms. Andrews specifically ordered Mother not to allow Stepfather "around Kaleb for [any] reason." Mother sensed that Ms. Andrews' support for her efforts to regain custody waned after this incident.

The court hearing on Mother's August 2007 DUI charge was held as scheduled in February 2008. Mother attended the hearing, at which she was ordered to attend a 28-day in-patient alcohol treatment program at Buffalo Valley recovery center beginning February 18, 2008.

On February 13, 2008, DCS filed a dependency and neglect petition in the Juvenile Court for Sumner County, Tennessee, asking the Juvenile Court to award temporary custody of Kaleb to Foster Mother. Mother was told that the purpose of the petition was to give Foster Mother the ability to make healthcare and other such decisions about Kaleb's care while Mother was in treatment at Buffalo Valley.

On February 15, 2008, the Juvenile Court held a hearing on the DCS dependency and neglect petition. A transcript of that hearing is not included in the appellate record. At the hearing, the Juvenile court appointed counsel for both Mother and Father, as well as a guardian ad

litem for Kaleb. The Juvenile Court later entered an order finding Kaleb dependent and neglected. The order required Mother to complete drug treatment and take parenting classes; it also provided that, if Mother chose to remain married to Stepfather, she would also be required to take anger management/domestic violence classes and attend reunification counseling with FSS. The Juvenile Court order granted "[p]rotective and temporary custody" of Kaleb to Foster Mother pending a final hearing scheduled for March 26, 2008, or until "further order of [the] Court." The contemporaneous case summary by Ms. Andrews indicated that Foster Mother was to have custody of Kaleb "until [Mother could] complete her treatment and obtain affordable housing." On February 18, 2008, Mother was admitted to Buffalo Valley, with an expected discharge date of March 17, 2008.

As anticipated, Mother was discharged from the treatment center in March 2008 after completing treatment. Nevertheless, Mother was told that impediments remained to her regaining custody of Kaleb. Her driver's license remained revoked for one year because of her second DUI charge. According to Mother, Ms. Andrews told her that she could not regain custody of Kaleb at that time, because she did not have a valid driver's license and had no way of transporting Kaleb without one. Also, Mother had not completed her required anger management classes. Consequently, Kaleb remained in Foster Mother's custody.

On March 26, 2008, the Juvenile Court conducted the scheduled final hearing on the DCS dependency and neglect petition. The appellate record does not contain a transcript of that hearing. After the hearing, the Juvenile Court entered an "Agreed Order of Adjudication and Disposition."[3] In that order, the Juvenile Court indicated that DCS, Mother, and Kaleb's guardian ad litem were all in agreement that Kaleb was dependent and neglected due to drug use in the home and the domestic violence between Mother and Stepfather. The Juvenile Court found that Mother and Stepfather "were not participating with services required under the Immediate Protection Agreement." It did not describe DCS's efforts with the family in the order, but it included in the order a finding that DCS had made reasonable efforts to reunify the family. The Juvenile Court concluded that it was in Kaleb's best interest to remain in the temporary custody of Foster Mother pending further orders of the court.

Following this adjudication, Mother continued to visit with Kaleb in the same manner as before her treatment, that is, an approximate two-hour visit once per week. Apparently, Foster Mother and Mother had developed a weekly routine whereby Mother would call Foster Mother on Tuesday or Saturday to arrange her visit with Kaleb. As before, Mother sometimes brought milk, diapers, toys, and other things to the visits.

---

[3] Although denoted as an "agreed" order, the order was signed only by counsel for DCS. Mother's attorney is included only in the certificate of service. Also, the order was not executed by the Juvenile Court or filed in the Juvenile Court Clerk's office until May 21, 2008.

### *End of DCS Involvement*

At some point in June 2008, Ms. Andrews was shopping in a local Walmart store and saw Mother there, shopping with Stepfather. There is no indication in the record that Ms. Andrews spoke to Mother at the Walmart store.

After that, DCS closed its case file on Kaleb and terminated any efforts to assist Mother. DCS records from June 8, 2008, stated: "This case is closing. . . . [Foster Mother] wants to keep custody of Kaleb and has information for an attorney, to see about her legal grounds for keeping him." A subsequent DCS notation indicates that the case was officially closed on June 25, 2008, and gives this rationale:

> Kaleb is safe and thriving in [Foster Parents'] home. [Mother] has made minimal progress and has not maintained consistent contact with Kaleb since the existence of the safety placement. [Mother] has remained with her husband with whom she reported that she would separate due to the domestic violence. [Mother and Stepfather] have received numerous charges and continue to spend time in jail. [Mother] completed her A/D Assessment and initial treatment and due to an [sic] DUI charge was ordered to return to another treatment at Buffalo Valley. [Mother and Stepfather] completed the Parenting Class. [Mother] has failed to maintain contact with this FSW, but at last contact she reported that she was going to begin her anger management class. This FSW found that she had not begun that service, nor had she started her domestic violence class. At this time, the determination has been made to close the FSS case due to stability and safety of the child. [Mother] will have to complete all services and file [a] petition within the court to request custody change.

DCS did not notify Mother that it had closed its file on Kaleb. There is no indication in the record that DCS notified the Juvenile Court that it had closed its file on Kaleb, that it had ceased monitoring his well-being, and that it had ceased its reunification efforts with Mother.

According to Mother, in June 2008, Mother called Ms. Andrews to let her know that Stepfather was incarcerated. When Mother finally made contact with Ms. Andrews, Ms. Andrews responded that Mother need not worry about that anymore, because the DCS case file on Kaleb had been closed. Mother asked Ms. Andrews about Paige and Kaleb. Ms. Andrews told Mother that she was free to go get Paige, because DCS had never opened a file for her. Ms. Andrews did not answer as to Kaleb.

Shortly after her telephone conversation with Ms. Andrews, Mother contacted Paige. Soon thereafter, Paige moved back into Mother's home.

After DCS closed its case file on Kaleb, the child continued to live with Foster Mother and Foster Father. As before, Mother continued to visit with Kaleb once each week based on mutually agreeable arrangements. Mother continued to sometimes bring items to the visits, such as milk, diapers, toys, and other things.

After DCS closed its case file on Kaleb, Mother continued to work on the tasks that she felt would help her regain custody of Kaleb. In September 2008, Mother completed anger management classes. In February 2009, Mother obtained reinstatement of her driver's license. In June 2009, Mother's divorce from Stepfather became final. Mother also completed all of the conditions of her probation arising out of her DUI charge.

Mother, however, struggled with other issues. In October 2009, after suffering a nervous breakdown, Mother was hospitalized for seven to ten days and treated for bipolar disorder. As a result of this hospitalization, Mother lost her regular hourly-wage job. After that, her employment was sporadic.

### *Petition for Termination and Adoption*

On December 2, 2009, Foster Parents filed the instant petition in the Chancery Court for Sumner County, seeking to terminate the parental rights of both Mother and Father and to adopt Kaleb. The grounds for termination asserted in their petition were abandonment for failure to visit or support Kaleb during the four months preceding the petition, and failure "to manifest an ability and willingness to assume legal and physical custody of the minor child."

On February 8, 2010, Mother filed a counterclaim, seeking to have custody of Kaleb returned to her. In her counterclaim, Mother asserted that she had successfully completed all the steps necessary to have her child returned to her custody, and that Kaleb was no longer dependent and neglected. Mother also filed a motion asking the trial court to establish visitation rights with the child for her. On March 31, 2010, the trial court entered an agreed order permitting Mother to have supervised visits with the child every Tuesday from 3:30 p.m. to 5:30 p.m. at a neutral location.

On December 3, 2010, Mother filed a motion for a restraining order and to set Christmas vacation and additional visitation. Mother sought to enjoin the Foster Parents from interfering with her visitation and from telling Kaleb to refer to Foster Mother and Foster Father as "Mother" and "Father." Mother also asked the trial court to permit her to visit with Kaleb in Mother's own home. On December 16, 2010, the trial court denied Mother's

request to have regular visitation in her own home; however, it changed the location for the visits from a neutral location to the home of Foster Parents. The trial court did, however, permit Mother to have a two-hour, supervised visit at Mother's home for Christmas.

On March 19, 2011, the trial court entered a default judgment against Father, terminating his parental rights.[4]

On November 30, 2011, after obtaining new counsel, Foster Parents filed an amended petition for termination of parental rights and adoption. In addition to the grounds for termination listed in the original petition, Foster Parents also asserted that Mother was in substantial noncompliance with the statement of responsibilities in the permanency plan after reasonable efforts by DCS, and that the conditions that led to the removal of the child had persisted for a period of six months preceding the petition for termination.[5]

On February 21, 2012, Mother moved to strike paragraph 16 of the Foster Parents' amended petition, which refers to a "permanency plan." Mother noted that no "permanency plan" ever existed, and the relevant statute permits termination of parental rights only when the parent has failed to comply substantially with a "permanency plan." Just prior to the scheduled trial, the trial court granted the motion to strike in open court. In doing so, the trial court commented that it did "not strike [the] service plan or any other agreements that the Court finds to be admissible."

### *Trial*

The trial on the Foster Parents' petition and Mother's counterclaim was conducted on February 23 and 24, 2012. The trial court heard testimony from FSW Ms. Andrews, and also from the Foster Parents and Mother.

Ms. Andrews testified at the outset. She told the trial court that FSS developed both the Family Services Plan and the Immediate Protection Agreements for Mother and Kaleb. Asked about the difference between a family services plan and an IPA, Ms. Andrews explained: "[An] 'Immediate protection agreement' is written at the onset of the case by the

---

[4]Father did not appeal the termination of his parental rights, and his rights are not at issue in this appeal.

[5]In their amended petition, Foster Parents purported to assert "each and every ground for termination . . . listed in Tennessee Code Annotated § 36-1-113(g)." In actuality, they specifically listed only a few grounds, with accompanying facts that would allegedly establish the listed grounds for termination. In this appeal, we consider only the specific grounds that were properly asserted in the amended petition; we decline to consider the blanket assertion of "each and every" ground for termination listed in the termination statute.

CPS investigator" to "detail[] specific allegations and risk factors that — that she deemed necessary — for the family to maybe participate in classes or complete treatment or whatever it may be. And it has some specific requirements for the family to complete." An IPA, she said, is another name for a "safety plan," and is designed to meet the child's immediate needs.

In contrast to an IPA, Ms. Andrews said, a family services plan, also called a noncustodial permanency plan or a "couple of different names," is more long-term in nature. The Family Services Plan for Mother set out certain tasks for her to complete in order to regain custody of Kaleb. Ms. Andrews testified that, for reasons she could not explain, Mother's actual Family Services Plan was not in the DCS case file and, she added, "[i]t doesn't exist." Ms. Andrews testified about Mother's Family Services Plan from memory, and claimed that she remembered Mother's Family Services Plan because she worked it with Mother.

Ms. Andrews claimed in her testimony that Mother was informed of the requirements of the Family Services Plan, even though the Plan was not produced for trial. She said that the Family Services Plan required Mother "to complete her alcohol and drug treatment and stay sober and clean and follow all of the recommendations of that treatment." The Service Plan also required Mother to complete parenting classes as well as classes on anger management and domestic violence. Ms. Andrews asserted that the Service Plan required Mother to receive reunification counseling, but said that reunification counseling was never ordered for Mother because Mother did not complete the other tasks required under the Service Plan.

Ms. Andrews asserted in her testimony that Mother did not substantially comply with the requirements in the Family Services Plan. Asked about her personal efforts to provide services and assist Mother in meeting the requirements of the Service Plan, Ms. Andrews replied that she was only required to "give [Mother] resources, give her numbers that she [could] call to get the services that she [was] needing to complete [w]hat's on the [Service Plan]." Ms. Andrews explained that she did not generally take an authoritative position with parents: "My objective is to make sure that the mother is educated to what's on the plan, what is expected of her. I often call and provide resources and support. And that's how I work." She added: "[A]ll I do is monitor the plan." Ms. Andrews stated that she generally does not tell any parents, and specifically did not tell Mother, that their children will be permanently removed from their custody if they do not meet the requirements of the DCS plan.

Early in her involvement in the case, Ms. Andrews said, she saw bruises on Mother, and Mother told her that the bruises were inflicted by Stepfather. Ms. Andrews spoke to Mother many times about Stepfather's abusive behavior, and she advised Mother to divorce Stepfather before she was seriously hurt. Ms. Andrews did not, however, prohibit Mother

from staying with Stepfather, and said, "I don't have a choice. . . . [S]he chose to remain with him." Ms. Andrews said that "[i]t's difficult to reunify in those situations."

At least from August 2007 through January 2008, Ms. Andrews testified, Mother was allowed weekly visits with Kaleb. Most of the visits were supervised by Foster Mother, but some unsupervised parenting time was allowed. Mother was not restricted in the number of visits with Kaleb, but she was required to call Foster Mother and work the visits around Foster Mother's schedule. Ms. Andrews said that she instructed Mother to be respectful of Foster Mother's family. Ms. Andrews acknowledged that she told Mother to bring supplies to Foster Mother to support Kaleb, and that Mother in fact brought diapers, wipes, milk, and food to the visits with Kaleb, at least through January 2008.

In February 2008, Ms. Andrews saw that Mother had a black eye and understood that it had been inflicted by Stepfather. After that, Stepfather was not permitted to have any contact with the child, and Ms. Andrews prohibited Mother from having unsupervised visits with Kaleb.

Ms. Andrews testified about the February 2008 Juvenile Court proceedings to place Kaleb in the temporary custody of Foster Mother. She indicated that DCS sought the temporary custody order because Mother was going to enter into Buffalo Valley for substance abuse and/or alcohol treatment, and Foster Mother needed an order of custody so that she could make decisions for Kaleb while Mother was in treatment. In her testimony, Ms. Andrews could not recall why Mother was not reunited with Kaleb when she was released from treatment in March 2008. Ms Andrews noted that, at the February 2008 hearing, Mother represented to the trial court that she was no longer living with Stepfather. At the time, Ms. Andrews said, she hoped that that was true.

Ms. Andrews testified about seeing Mother shopping with Stepfather in the local Walmart store in June 2008. When she saw that, Ms. Andrews said, she knew that Mother and Stepfather were back together.

Ms. Andrews said that she presented Mother's FSS file to DCS for closure on June 25, 2008. She did not inform Mother at the time that her case file was being closed, and Ms. Andrews offered no explanation for failing to communicate the DCS decision to Mother. Ms. Andrews explained: "The basis of my closure was lack of compliance . . . in completing the requirements of the Family Services Plan." Ms. Andrews claimed that Mother and Stepfather did not complete either anger management classes or domestic violence classes. She also asserted that Mother would not "stay[ ] sober and clean." Ms. Andrews also claimed that Mother had failed to maintain her relationship with Kaleb. Testifying from memory about Mother's Family Services Plan, Ms. Andrews could not recall whether it included any

requirement for Mother to maintain her relationship with Kaleb, but she asserted that maintaining a "relationship is always included in that service plan," and that such a requirement is "understood between a mother and an eleven-month-old baby." During this same time, Ms. Andrews claimed, Mother would not stay in contact with her. Ms. Andrews' June 25, 2008 case notes indicated that both Mother and Father had "received numerous charges and continue to spend time in jail," but in her trial testimony, Ms. Andrews could not recite an occasion on which Mother spent time in jail other than for her August 2007 DUI charge. Despite the fact that Ms. Andrews submitted Mother's case file for closure within days after she saw Mother at the Walmart with Stepfather, Ms. Andrews denied that Mother's case was closed because of that incident. After Mother's case was closed, Ms. Andrews said, she had no further contact with Mother.

Foster Parents also testified at trial. They were married in April 2008, a few months after Foster Mother obtained physical custody of Kaleb. At the time of trial, the Foster Parents lived in the same home in which Foster Mother was living when she obtained custody of Kaleb, a two-bedroom home on an acre of land. During the week, while Kaleb was in school, Foster Mother worked as a waitress and Foster Father worked at his family's drywall company. At the time of trial, Foster Mother was pregnant with the couple's first biological child.

Foster Mother testified that, when she first obtained custody of Kaleb, Mother visited the child each week on Sundays for about two and one-half hours. Later, they agreed to change the visits to Tuesdays, and Mother stayed about two hours for each visit. Foster Mother said that there were only a very few occasions on which she prevented Mother from visiting Kaleb, and only because there was a scheduling conflict. Foster Mother supervised the visits, as per her instructions from DCS. Foster Mother testified that there were no formal visitation arrangements; instead, she and Mother worked the visitation out between them. Describing the visits, Foster Mother testified that Mother and Kaleb play games together, paint, and do other activities. During the entire time in which she had had custody of Kaleb, Foster Mother said, Mother had only three or four overnight, unsupervised visits with the child.

Foster Mother said that Mother continued this arrangement for visiting Kaleb right up until the trial court entered an order establishing a visitation schedule. During the months before the petition was filed, Foster Mother testified, Mother visited Kaleb twice in June, July, and August, but in every other month, Mother visited three to four times. After the March 2010 visitation order was entered, Mother attended most of the scheduled Tuesday visits for two hours.

Prior to the filing of Foster Parents' petition, Foster Mother said, Mother never paid regular child support to Foster Parents. Foster Mother noted that Ms. Andrews had told Mother to

bring items such as diapers, wipes, food, milk, clothing, toys, and similar items to support the child. In the beginning, Foster Mother stated, Mother brought such items for Kaleb on every visit. This practice continued through 2007 and 2008.[6] Sometimes, Foster Mother said, Mother called prior to the visit and offered to pick up whatever Kaleb needed; when she did, Foster Mother told Mother that Kaleb did not need anything. Foster Mother observed that Mother must have hit "a rough patch" because, at the end of 2008 and in 2009, Mother's practice of bringing supplies for Kaleb became more sporadic. From 2009 to 2011, Foster Mother testified, Mother sometimes brought items such as clothes, water games, and the like to the visits, but "sometimes [she] would not bring anything for Kaleb." At some point in 2011, Mother ceased bringing items to her visits with Kaleb, and instead she began to pay Foster Mother $20 per week. Foster Mother confirmed that Mother had consistently paid this amount up until the time of the trial. Foster Mother was aware that Mother had maintained a variety of jobs, but at the time of trial, she did not know whether Mother had steady employment.

By the time of trial, Kaleb had lived with Foster Parents for four and one-half years. Foster Mother testified that Kaleb calls Mother "Christy" and calls Foster Parents "Mama" and "Daddy." She said that Kaleb was enrolled in kindergarten and was doing well in school. By all objective measures, at the time of trial, Kaleb was thriving in the Foster Parents' custody, and they were taking care of the child's physical, educational, and emotional needs. Foster Mother opined that Mother would not be able or willing to care for Kaleb in Mother's home, and that returning Kaleb to Mother's custody would create a risk of substantial harm to the child.

Mother testified at trial on her own behalf. She first recounted the events that led her to ask Foster Mother to take custody of Kaleb. Mother said that, when Ms. Andrews first met with her, she told Mother that, so long as Mother and Foster Mother were able to work together on visitation, "she was great with that." Mother said that she was not given any guidelines or directions as to how often she should visit with Kaleb or how long the visits should be. Even though the IPAs required Mother's visitation with Kaleb to be supervised, Mother said that Foster Mother allowed Mother to keep Kaleb, unsupervised, while Foster Mother worked her shift at the restaurant. When Ms. Andrews learned of this, she expressed disapproval and said that Mother's visits needed to be supervised by either Foster Mother or Paige's father. After that, Foster Mother and Mother worked out a visitation schedule in which Mother would visit for two hours on Sundays; later the visits were changed to Tuesdays. From August 2007 until the time of trial, Mother stated, she visited Kaleb on one day per week, nearly every week, for approximately two hours each visit.

---

[6]Foster Father said that he did not recall Mother bringing items to Kaleb as often as Foster Mother indicated.

In February 2008, Mother said, she agreed to have Kaleb adjudicated dependent and neglected and to have temporary custody awarded to Foster Mother because DCS told Mother that, if she did not agree to such an arrangement, the child would be placed in State protective custody. Mother was under the impression that she would regain custody of Kaleb in March 2008, when she returned home from treatment at Buffalo Valley.

Mother testified that, after she returned home from Buffalo Valley, she met with Ms. Andrews in anticipation of regaining custody of Kaleb. At that time, however, her driver's license had been revoked for one year as a result of the DUI charge. According to Mother, Ms. Andrews told her that she could not regain custody of Kaleb until she completed her anger management classes *and* obtained her driver's license, because she could not risk further imprisonment by driving with Kaleb in the car. Mother recalled that Ms. Andrews also told Mother that if she chose to stay with Stepfather, she would never regain custody of Kaleb, and that divorcing Stepfather would prove that she was no longer with him.[7]

Mother indicated that her agreement in March 2008 to have the Juvenile Court enter an order holding Kaleb dependent and neglected was based on her conversation with Ms. Andrews. Mother testified that, even though the Juvenile Court appointed an attorney for her, she did not remember talking to the attorney and did not remember the attorney being present on her behalf at the March 2008 dependency and neglect hearing. Mother said: "I don't even think [the appointed attorney] was there that day. They gave me a card to call." She said that no one explained to her what "dependent and neglected" status meant, and she was given to understand that the custody arrangement with Foster Parents was only temporary until she completed her tasks and got her driver's license back. After the hearing, Mother continued to visit Kaleb on a weekly basis as always. Mother said that Ms. Andrews cautioned Mother not to inconvenience Foster Mother because, as Ms. Andrews characterized it, Foster Mother was doing Mother a favor by keeping Kaleb while Mother got help for her problems.

Mother testified that Ms. Andrews' support of her efforts to regain custody of Kaleb stopped altogether after Ms. Andrews saw Mother with Stepfather at Walmart. In June 2008, Mother stated, Stepfather was incarcerated in Mississippi. Mother then tried to call Ms. Andrews to tell her that Stepfather would no longer be an impediment to Mother regaining custody of Kaleb, and that Mother had completed her anger management classes. Mother claimed that Ms. Andrews would not answer or return her telephone calls. Mother said that, when she "finally got a hold of [Ms. Andrews]," Ms. Andrews said that "it didn't matter anymore, that [Mother] didn't have to call her anymore because" her case had been closed. Mother said that Ms. Andrews explained that she closed Mother's case file because "she had seen

---

[7]Mother told Ms. Andrews that Stepfather had moved out and that she was no longer with him. According to Mother, however, Ms. Andrews wanted Mother to divorce him.

[Mother] and [Stepfather] at Walmart together . . . [and that] she knew [they] were back together and she was closing the case out because [Mother] would not leave [Stepfather]."

After learning that her case had been closed, Mother called Foster Mother. Foster Mother was already aware that DCS had closed Mother's case. Foster Mother told Mother that she could still have weekly visits with Kaleb, but Mother sensed that Foster Mother was angry at Mother for not leaving Stepfather. Mother testified that her weekly visits with Kaleb remained consistent through 2009, except they decreased during the summer months due to scheduling conflicts or communication issues. Mother said: "[S]ometimes it was down to just twice a month. I got to feeling . . . like I was losing him."

In September, October, November, and December of 2009, Mother stated, she was again able to visit Kaleb three or four times a month. In September 2009, Mother gave Kaleb a birthday party, complete with a cake and presents for the occasion. In October 2009, even though Mother had lost her job, she stated, she still brought Kaleb "clothes and things" during her visits. Mother asked Foster Mother for a visit with Kaleb for Halloween, but Foster Mother refused because she had already made other plans. Mother also asked to see Kaleb on Thanksgiving, but Foster Mother again had made other plans. Just before Thanksgiving, during one of Mother's visits, Foster Mother informed Mother that she and Foster Father planned to try to adopt Kaleb. This prompted Mother to retain counsel to oppose the adoption.

Mother said that she was not aware of the separate Service Plan to which Ms. Andrews testified, but she knew the tasks assigned to her in the three IPAs. She started her tasks by completing alcohol and drug treatment at Bradford Health Services in 2007. After that, she looked for places where she could take parenting and anger management/domestic violence classes on her own. When she asked Ms. Andrews for help, Mother said, Ms. Andrews "said she didn't know where to advise me to look for them." In her testimony, Mother was asked, "[Ms. Andrews was] wanting you to [take the classes], but she [couldn't] help you do it?" Mother replied, "Right." Finally, Mother said, she found parenting classes and completed them in January 2008. Mother said that she found an anger management class through Stepfather's parole officer, and completed it in June 2008, after DCS closed her case. Mother said that she did not complete the reunification counseling with FSS because Ms. Andrews did not schedule it.

Mother testified that she supported Kaleb during the entire time Foster Parents had custody of Kaleb by giving him boxes of diapers and wipes, food, snacks, clothing, toddler bed, blankets, toys, and anything else he needed. She said that she brought "at least a toy every week" to Kaleb. Echoing Foster Mother's testimony, Mother said that on occasions when she asked Foster Mother if Kaleb needed anything, Foster Mother would say "no" and tell

Mother to bring Kaleb something only if she wanted to. Mother said she "felt like all the efforts that [she] tried and things that I would do . . . wasn't good enough or . . . [Foster Mother] didn't want me to help." This feeling was reinforced, Mother stated, when she saw blankets that she brought for Kaleb covering the windows at Foster Parents' house and toys that she brought him left out in the rain to ruin.

Mother testified that no one at DCS, including Ms. Andrews, ever told her to pay child support to Foster Mother. To the contrary, when Mother told Ms. Andrews that she was providing supplies to Foster Mother for Kaleb, Ms. Andrews told Mother "just to continue to take the things he needs." Mother conceded that she did not consistently give money to Foster Parents for Kaleb's support until August or September of 2011, when she started paying Foster Parents $20 per week. Mother felt that she had provided for Kaleb the best that she could, given her limited means.

Mother testified about her mental health, substance abuse, and legal issues. She said she was treated for bipolar disorder in October 2009, and as a result of her diagnosis, she was prescribed an anti-depressant, Prozac and a mood-stabilizer, Seroquel.[8] Mother claimed that she had not used any illegal drugs in the four and one-half years prior to trial, and that she had not had any alcohol since the fall of 2010. She admitted having received some misdemeanor charges over the years — driving with a revoked license in 2008, assault in 2010 (a bar fight), and shoplifting in 2011.

By the time of the trial, Mother asserted, she had established a safe and stable home for Kaleb. In January 2010, she moved out of Mr. Bullard's home and into a home owned by her father.[9] Her father did not require her to pay rent, so long as she maintained the home. In the fall of 2010, Mother met Timothy C. ("New Stepfather") and married him in March 2011. In November 2011, Mother gave birth to a son. At the time of trial, Mother, New Stepfather, Paige, and the new baby were all living together in the house owned by Mother's father. Mother introduced into evidence photographs of their house to show that they had prepared a bedroom for Kaleb, in the event that the trial court returned custody to her. Mother stated that their new baby at times accompanied her on her visits with Kaleb, but she also visits Kaleb without the baby so that she can devote her full attention to Kaleb.

Mother testified that New Stepfather has been a positive influence in her life and on Paige's life. She said that New Stepfather does not drink alcohol, use drugs, or physically abuse her,

---

[8]Mother was also prescribed Amoxicillin (antibiotic) and Lortab (pain medicine) because she had broken a tooth.

[9]Mr. Bullard also testified briefly at trial, but his testimony is not pertinent to the issues on appeal.

and he influenced her to stop drinking alcohol. She also stated that he has been willing to support her financially, and has taken on extra work in order to do so. Mother described her husband as a supportive father and stepfather, adding that family is "really important to Tim." In her testimony, Mother acknowledged that New Stepfather has criminal violations in his background, and that she did not learn about them until discovery was taken in this case.

Over the years, Mother said, she maintained only sporadic employment, usually in hourly-wage jobs. Until her marriage to New Stepfather, she was supported by her parents and other friends.[10] In 2008, Mother earned about $2,290, and in 2009 about $11,000. At the time of trial, Mother did not have a job outside the home because she was a "stay-at-home mom." She planned to get a job when their new baby was about six to eight months old. The family was receiving food stamps of about $600 per month.

Mother acknowledged that Foster Parents had taken excellent care of Kaleb while he was in their custody, that they have a safe and stable home, and that they are fit foster parents. She recognized that Foster Parents love Kaleb, and that Kaleb loves Foster Parents, and said if she were to regain custody of Kaleb, she would make sure Kaleb was able to maintain contact with Foster Parents to some extent.

The trial court also heard testimony from New Stepfather. He acknowledged his criminal record, namely, a felony conviction for possession with intent to sell cocaine and various misdemeanor charges many years prior to trial. New Stepfather claimed that he completed drug treatment five or six years prior to trial, well before he met Mother, and that he had remained sober and free of drugs since he left the treatment facility. New Stepfather testified that he was the co-owner of a mobile barbeque truck and earned about $400 to $600 per week in cash in this business. He said he also picked up odd jobs to help support his family. New Stepfather testified that he was willing to help Mother raise and support Kaleb. This concluded the testimony at trial, and the trial court took the matter under advisement.

### *Trial Court Decision*

On March 22, 2012, the trial court entered its order and memorandum opinion in the case, finding that Foster Parents had established by clear and convincing evidence two grounds for termination of Mother's parental rights: (1) that Mother had abandoned Kaleb by failure to support him for a period of four consecutive months preceding the filing of the termination petition, and (2) that Mother had substantially failed to comply with the "plan of care" for the reunification of the child, referring to the Family Services Plan developed by DCS.

---

[10]Mother acknowledged that she had a brief romantic relationship with her landlord at the time, Mr. Bullard, who was then in his mid-sixties, and that he at times provided her financial assistance.

Regarding abandonment for failure to support, the trial court made a factual finding that Ms. Andrews had suggested to Mother that she pay Foster Mother $20 per week, but Mother did not do so despite having the ability to pay. As to the second ground, the trial court found that, although DCS had lost the Family Services Plan for Mother, "DCS records confirm a plan and that there was a plan was not disputed." The trial court made a factual finding that Mother "was provided with a copy of the Plan of Care and was personally informed of its contents by the Family Service Worker (FSW) and the statements were reasonable." In its findings, the trial court noted that Mother had been "informed of her right to go to Juvenile Court to seek return of custody of the child," but she did not do so. To further support its holding, the trial court made the following findings of fact:

a. [Mother] has not made an adjustment of circumstance in conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent.

b. [Mother] had a competent Family Service Worker assigned to her case with reunification planned and [Mother] failed to effect a lasting adjustment to provide a safe stable environment for the child.

c. [Mother] did visit and maintain contact with the child; the parent did not seek from Juvenile Court a return of custody to her even though advised by FSW that she could go to Juvenile Court and get the child.

d. There is no meaningful relationship established between the parent and the child. The mother did not utilize her rights to seek custody of the child but allowed her child of tender years to remain with plaintiffs.

e. A change of caretaker and physical environment will have adverse effect on the child's emotional and psychological welfare.

f. The mother has divorced [Stepfather], and has remarried. The short duration of this new marriage does not allow for a determination of the new stepfather.

g. Evidence from the FSW is that the home of [Mother] is not safe and stable for return of the child. Changes made after [DCS] closed the case have not demonstrated to the court any thoughts, concerns, or plans for establishment of attachment.

The trial court found explicitly that Foster Parents did not establish by clear and convincing evidence that Mother abandoned Kaleb for failure to visit for the four months preceding the petition. The trial court also found by clear and convincing evidence that termination of Mother's parental rights was in Kaleb's best interest.

Based on these findings, the trial court terminated Mother's parental rights as to Kaleb. It also denied the relief sought in Mother's counterclaim for custody and dismissed her petition. From this order, Mother now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother argues that the trial court erred in terminating her parental rights. She contends that the record does not contain clear and convincing evidence to support the grounds of (1) substantial noncompliance with the Family Services Plan and (2) abandonment for failure to provide support. She also argues that the record does not contain clear and convincing evidence to support the trial court's conclusion that terminating her parental rights was in the best interest of the child.

Foster Parents challenge on appeal the trial court's conclusion that they did not establish by clear and convincing evidence that Mother had willfully abandoned Kaleb by failure to visit. They contend that Mother's visitation during the four-month period preceding the filing of the termination petition amounted only to token visitation, so a finding of abandonment by failure to visit was warranted.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1) (2012). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

"No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citing *M.L.B v. S.L.J.*, 519 U.S. 102, 119 (1996)). The heightened burden of proof in cases involving the termination of parental rights serves to minimize the risk of an erroneous decision. *Id.* Evidence satisfying the clear and convincing evidence standard must establish

that the truth of the facts asserted are "highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4 (Tenn. Ct. App. Jan. 10, 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003)). Clear and convincing evidence must produce a firm belief or conviction in the fact finder's mind regarding the truth of the facts sought to be established. *Id.* (citing *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

Because of the clear and convincing evidence burden of proof in parental termination cases, appellate courts must adapt the customary standard of review as set forth in Rule 13(d) of the Tennessee Rule of Appellate Procedure. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, each of the trial court's specific factual findings must be reviewed *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Tiffany B.*, 228 S.W.3d at 156; *see* Tenn. R. App. P. 13(d). When the trial court's factual findings are based on the assessment of a witness's credibility, this Court will afford great weight to those determinations and will not reverse such determinations absent clear evidence to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Second, the appellate court must decide whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *In re Audrey S.*, 182 S.W.3d at 861; *In re Askia K. B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7 (Tenn. Ct. App. Oct. 7, 2011). The trial court's conclusions of law are reviewed *de novo* with no presumption of correctness. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810; *In re Tiffany B.*, 228 S.W.3d at 156. This standard of review was clarified and reiterated in *In re Taylor B. W.*, No. E2011-00352-SC-R11-PT, 2013 WL 635934, at *6 (Tenn. Feb. 21, 2013).

# ANALYSIS

## Grounds for Termination

### *Substantial Noncompliance*

Mother first argues that the trial court erred in terminating her parental rights based on her failure to comply with the DCS Family Services Plan. She points out that the Family Services Plan was lost and was never admitted into evidence; under those circumstances, both the requirements of the Plan and whether Mother complied with them are unclear. Moreover, even if the trial court properly considered the Family Services Plan as the equivalent of a "permanency plan" under Section 36-1-113, Mother argues, her rights cannot be terminated based on her failure to comply with it when (1) Kaleb was never in State custody, (2) the Family Services Plan was never approved by a court, and (3) there was never a court hearing to advise Mother of the consequences of her failure to perform under the Service Plan in accordance with Tennessee Code Annotated § 37-2-403(a)(2)(B)(i). Furthermore, Mother contends, the evidence at trial showed that she had satisfied every requirement in the Family Services Plan by the time the petition for termination was filed, so the record does not contain clear and convincing evidence of substantial noncompliance. For all these reasons, she argues, the trial court erred in terminating her rights based on substantial noncompliance with the Family Services Plan.

As to this ground, the Foster Parents argue that the "requirements that the Mother had to meet were adequately described in the Immediate Protection[] Plans and in the Juvenile Court Order." The Foster Parents appear to measure Mother's compliance as of the date DCS closed Mother's case file in June 2008, noting that, at that time, Mother was still married to an abusive husband and had not started her required domestic violence or anger management classes. Foster Parents offer no authority for measuring Mother's compliance as of the date DCS abruptly decided to end its involvement in the matter.

Under Tennessee Code Annotated § 36-1-113(g)(2), a biological parent's rights may be terminated if "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4 . . . ." Tennessee Code Annotated § 37-2-403 sets out the specific requirements for a permanency plan:

> (2)(A) The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the

-21-

achievement of the goal specified in subdivision (a)(1). The statement shall include the definitions of "abandonment" and "abandonment of an infant" contained in § 36-1-102 and the criteria and procedures for termination of parental rights. Each party shall sign the statement and be given a copy of it. The court must review the proposed plan, make any necessary modifications and ratify or approve the plan within sixty (60) days of the foster care placement. The department of children's services shall, by rules promulgated pursuant to the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 2, determine the required elements or contents of the permanency plan.

Tenn. Code Ann. § 37-2-403(a)(2). Thus, a "permanency plan" must include the agency's responsibilities as well as the parent's responsibilities. It must also include "the criteria and procedures for termination of parental rights." The statute requires that a court "ratify or approve" the plan within 60 days of foster placement. Section 37-2-403 also provides that substantial noncompliance with the permanency plan is a ground for termination of the parental rights of the biological parent:

(C) Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

Tenn. Code Ann. § 37-2-403(a)(2)(C).

The ultimate determination of whether there has been substantial noncompliance by the parent with the permanency plan is a question of law, to be reviewed on appeal *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548. Termination of parental rights based on noncompliance under Tennessee Code Annotated § 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. To prove the ground set forth in Section 36-1-113(g)(2), the party seeking termination "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *Id.* at 656-57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, the party seeking termination must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular

-22-

requirement that has not been met." *Id.* at 657 (citing *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

We must conclude that the Foster Parents have made no showing as to why the ground of substantial noncompliance should be applied at all under the facts of this case. As can be seen from the language quoted above, the statutes on substantial noncompliance have significant built-in protections for the rights of the biological parent. These protections come into play only when DCS has taken the child into State protective custody. Here, DCS repeatedly warned Mother that Kaleb could be taken into State protective custody, apparently to obtain her cooperation with their directives, such as ordering her to find a temporary custodian for Kaleb and having her agree to a Juvenile Court dependency and neglect order. Kaleb, however, was in fact never placed in State protective custody; he was instead "safety-placed" with Foster Mother. The record does not contain any definition of safety-placement or outline DCS's authority and responsibility under such circumstances.

Moreover, the record in this case indicates that DCS's role throughout the entire matter was muddy and indistinct. Despite having refrained from taking Kaleb into State protective custody, DCS clearly exercised authority over both Mother and Foster Mother; it imposed requirements on Mother via the IPAs and the now-lost Family Services Plan, restricted her visitation with the child, and required Foster Mother to supervise Mother's visitation. DCS, however, appears to have assumed none of the responsibility that would normally accompany the exercise of such authority. Ms. Andrews openly disavowed any real responsibility, and said that her job consisted merely of "monitoring" the Family Services Plan. Ms. Andrews claimed to have furnished Mother with some telephone numbers for her assignments under the Family Services Plan; Mother asserted that Ms. Andrews did not even do that. Ms. Andrews testified that she did not tell Mother anything about the possibility that her parental rights could be terminated if she failed to comply with the requirements in the Family Services Plan; indeed, the record contains no indication that Mother ever knew that her parental rights were at risk until the Foster Parents told her that they planned to try to adopt Kaleb. The failure of DCS to assume any responsibility is perhaps best exemplified by its inexplicable decision to abruptly *close the case file* shortly after Ms. Andrews spotted Mother shopping with Stepfather at the local Walmart store. DCS did not even see fit to inform Mother of its decision. The parties were obviously uncertain as to DCS's role; even after DCS "left the building," so to speak, Mother gamely continued to try to comply with the requirements of the now-nugatory IPAs and Family Services Plan, and Foster Mother continued to enforce the visitation limitations that Ms. Andrews had imposed. It is apparent that DCS never assumed responsibility to assist Mother in resolving the issues that led to Kaleb's "safety-placement" or to reunify Mother and Kaleb.

All of this shows that the circumstances of this case are not appropriate for application of the ground of substantial noncompliance with the permanency plan. In a more typical parental termination case involving the ground of substantial noncompliance, "we, of course, start with a review of the permanency plan." ***In re Abigail F. K.,*** No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *12 (Tenn. Ct. App. Sept. 14, 2012). Our analysis must begin with a review of the language in the permanency plan because we must first determine whether the plan meets the statutory requirements described above. ***See*** Tenn. Code Ann. § 37-2-403(a)(2). Specifically, we must review the plan to determine whether it clearly sets forth a parent's obligations in the "statement of responsibilities," in order to ensure that the plan "clearly communicate[s] to the parent: this is what you must do to regain custody of your child." ***Id.*** at *13. We must also determine whether the plan adequately sets out the responsibilities of "the agency and the caseworker of such agency" and whether all of the parties' responsibilities are "reasonably related to the achievement of the goal specified in subdivision (a)(1)." Tenn. Code Ann. § 37-2-403(a)(2)(A). The plan language would also show if the statement of responsibilities includes "the criteria and procedures for termination of parental rights," as is required by statute. ***Id.***

Here, we are told that there was at some point a Family Services Plan, but that it cannot now be found. The only evidence of the contents of the Plan is Ms. Andrews' trial testimony, taken from her own recollection and references to the DCS case summaries. Mother testified that she did not recall the existence of a Family Services Plan; she thought that the obligations imposed on her by DCS arose out of the requirements in the three IPAs. On appeal, the Foster Parents, unable to point to any plan in the record, go so far as to contend that we should glean the contents of the Family Services Plan from the IPAs.[11]

We acknowledge that the trial court made a factual finding that the Family Services Plan existed and that it generally required Mother to obtain drug and alcohol treatment, remain sober, complete parenting classes and anger management classes, and obtain reunification counseling, based on the trial court's decision to credit the testimony of Ms. Andrews. We defer to the trial court on its determinations as to the witnesses' credibility. ***See Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). Even crediting Ms. Andrews' testimony that a Service Plan existed and that it listed certain responsibilities for Mother, she did not testify, and the record does not show, that this Service Plan was a "permanency plan" of the type that

---

[11] The parties' appellate briefs seem to reflect some uncertainty over whether the trial court terminated Mother's rights for failure to comply with the Family Services Plan or the IPAs. A plain reading of the trial court's order indicates that the trial court terminated Mother's parental rights based on her failure to comply with the "lost" Family Services Plan. The trial court indicated that this was proper based on the version of Section 37-2-403 that was in existence in December 2009, which permitted the termination of parental rights for noncompliance with the terms of "a permanency plan *or a plan of care*."

is required when a child is taken into DCS custody. As noted above, this is because Kaleb was never actually taken into State protective custody. Ms. Andrews gave no indication in her testimony that the Family Services Plan recited any responsibilities for DCS at all, other than to follow up to determine the level of Mother's compliance with her duties. It is undisputed that the Family Services Plan did not inform Mother of the criteria and procedures for the termination of parental rights. The Family Services Plan was never approved by a court, as is required under Section 37-2-403(a)(2). Therefore, the Family Services Plan cannot be considered the type of "permanency plan" or "plan of care" that can serve as the basis for terminating the parental rights of a biological parent under Section 37-2-403.[12]

Moreover, when the State seeks termination of the parental rights of a biological parent on the grounds of substantial noncompliance, the party seeking termination must show that DCS complied with its statutory duty to make reasonable efforts to facilitate the safe return of the child to the child's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. § 37-1-166(b), -166(a)(2), -166(g)(2)); *see also In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of substantial noncompliance for DCS's failure to make reasonable efforts). The statutory duty to make reasonable efforts includes an obligation to exercise "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." *In re R.L.F.,* 278 S.W. 3d at 316 (citing Tenn. Code Ann. § 37-1-166(g)(1)). DCS never assumed the responsibility to make reasonable efforts in this case, and its efforts in any event would fall far short of the standard. *See, e.g., In re Georgianna H.,* 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) ("While the Department's reunification efforts need not be 'herculean,' the Department must do more than simply provide the parents with a list of services and send them on their way." (footnote omitted)); *see also In re Chase A. C.,* No. E2009-01952-COA-R3-PT, 2010 WL 3257711, at *19 (Tenn. Ct. App. Aug. 18, 2010).

Here, we do not address whether the ground of substantial noncompliance may be ever relied upon by private parties, such as prospective adoptive parents who seek to terminate the parental rights of a child's biological parent. We hold only that the statutory requirements for termination based on substantial noncompliance should not be watered down simply because the party seeking termination is a private party instead of DCS. In light of this, we hold that it is inappropriate to terminate based on the ground of substantial noncompliance with the Family Services Plan under the circumstances of this case, where DCS did not take

---

[12]As noted above, the prior version of Section 37-2-403 referred to a "plan of care" as well as a permanency plan; this language was amended out of the statute by the Tennessee legislature in 2010. A "plan of care," however, was subject to the same statutory requirements, so we reach the same result under either version of the statute.

the child into State protective custody, did not create a "permanency plan" that satisfied the requirements of the statute, did not obtain court approval of any permanency plan, did not include in the permanency plan notification to Mother of the criteria for termination and the consequences of failing to comply with the DCS plan, and did not undertake to provide reasonable efforts to assist Mother.

For all of these reasons, we reverse the trial court's termination of Mother's parental rights based on the ground of substantial noncompliance.

### *Failure to Support*

Mother also argues that the trial court erred in terminating her parental rights based on willful failure to support Kaleb during the four months preceding the filing of the termination petition. Mother argues that the record does not support the trial court's finding that Ms. Andrews "suggested" that she pay Foster Parents $20 per week and that she failed to provide support. Mother points to her own testimony that Ms. Andrews consistently told her to bring Foster Mother supplies for Kaleb, as well as undisputed testimony that when Mother asked Foster Mother what Kaleb needed for her to bring to the visits, Foster Mother always told her that Kaleb did not need anything. Therefore, Mother argues, the trial court erred in terminating her parental rights on this ground.

In response, Foster Parents argue that it is undisputed that Mother never paid financial support for Kaleb during the four months preceding the filing of the termination petition or at any other time. They concede that Mother brought Foster Mother some supplies for Kaleb during the first year in which Foster Parents had custody of the child. They claim, however, that Mother's support during the four months preceding the filing of the termination petition was limited to bringing him "a few pairs of pants." They assert that Mother "did not offer any money to [Foster Parents] until September 11, 2011, long after the petition had been filed." The Foster Parents point out that the lack of a court order requiring Mother to pay support for Kaleb does not excuse her from doing so. Foster Parents acknowledge that Mother was unemployed during most of the four years in which they had custody of Kaleb, but contend that her underemployment was voluntary. Therefore, they claim, the evidence supports the trial court's finding that Mother failed to pay any support for Kaleb during the four months preceding the filing of the termination petition, and that her failure to pay was willful.

Under Tennessee statutes, the parental rights of a biological parent can be terminated based on "abandonment" as that term is defined in Section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). The pertinent part of Section 36-1-102 defines "abandonment" as follows:

-26-

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have *willfully failed to support or have willfully failed to make reasonable payments toward the support of the child* . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i) (emphasis added). The statute further defines the phrase "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." *Id.* at § 36-1-102(1)(D). Because a biological parent has a constitutional right to the care and custody of his or her child, the parent's failure to pay support for or to visit a child in the custody of another does not constitute a valid ground to terminate that parent's rights unless the failure to do so is found to be "willful." *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999); *In re M.L.D.*, 182 S.W.3d at 896; *Menard v. Meeks*, 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000). Failure to support a child is deemed "willful" if "a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Navaeh L.*, No. E2009-01119-COA-R3-PT, 2011 WL 346058, at *7 (Tenn. Ct. App. Feb. 3, 2011).

Against that background, we focus on Mother's behavior during the four months preceding the filing of the petition, from August 2 through December 2, 2009. We must review the record to determine if clear and convincing evidence supports a finding that Mother failed to make payments toward the support of Kaleb during that time period, and that her failure to do so was willful.

In this case, the trial found that Mother willfully failed to support Kaleb based on its factual finding that Ms. Andrews "suggested that [Mother] pay $20.00 per week as child support. That was not done." From our review of the record, we must respectfully hold that the evidence adduced at trial preponderates against this factual finding. We find no testimony by Ms. Andrews that she told Mother to pay Foster Mother $20 per week in support of Kaleb. To the contrary, she testified that she told Mother to bring supplies and things that Kaleb needed to Foster Parents, and that Mother followed those instructions. Of course, Ms. Andrews was involved in the case only through June 2008, so she was not even in contact with Mother during the four months preceding the termination petition. Thus, the preponderance of the evidence weighs against the trial court's factual finding and in favor of a finding that Ms. Andrews never told Mother to pay Foster Mother $20 per week in support of Kaleb at any time during her involvement in the case.

We note, however, that Mother is presumed to know that she has a duty to provide financial support for her child. *See In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009); Tenn. Code Ann. §36-1-102(1) (enacted 2010) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children."). Mother was never under a court order to make support payments, but "the obligation to pay support exists even in the absence of a court order to do so." *DCS v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) (citing *DHS v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997)). On the element of willfulness, though, we are required to consider all of the surrounding circumstances. "Mother's knowledge of a duty or expectation that she provide support and visit is a factor in determining willfulness." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *11 (Tenn. Ct. App. Apr. 29, 2005); *see also In re M.J.B.*, 140 S.W.3d at 655 (finding a lack of clear and convincing evidence to terminate when no evidence in the record proved that the mother was aware of her duty to make child support payments).

The evidence regarding Mother's support of Kaleb during the time in which he was in Foster Parents' custody is, for the most part, undisputed. It is undisputed that Mother did not pay child support to Foster Mother until after the petition for termination was filed. The evidence is also undisputed that Mother established a practice of giving Foster Mother in-kind support for Kaleb, in the form of items for Kaleb brought to her visits. Ms. Andrews testified that "at least through January 2008," Mother consistently brought diapers, wipes, toys, and other things for the child during her visits. Mother testified that Ms. Andrews encouraged her to continue this practice, and that she followed Ms. Andrews' suggestion. Foster Parents acknowledged at trial that Mother brought items for the child to her visits from 2007 through the early part of 2009, and said only that Mother's gifts became less consistent from 2009 to 2011. Foster Mother stated that, during those years, Mother sometimes brought Kaleb clothes, water games, or other activities, but "sometimes [she] would not bring anything for Kaleb." Mother testified that she continued to bring in-kind support for Kaleb to the Foster Parents, although it became more sporadic when she was unable to work. Mother pointed out that, in September 2009, she gave Kaleb a birthday party and presents, complete with a Spongebob birthday cake. In October 2009, Mother lost her job after being hospitalized for a nervous breakdown. She asserted that, although she brought less items for Kaleb after that, she still continued to bring him "clothes and things" during the four months preceding the filing of the termination petition.

Thus, in this case, Mother's routine method of providing support was to give Kaleb in-kind gifts, not monetary support. All evidence indicates that Foster Parents acquiesced in this manner of support, and they never asked Mother to pay them money instead. Indeed, both Foster Mother and Mother testified that, when Mother asked Foster Mother to tell her something specific that she should bring for Kaleb, Foster Mother always responded that the

-28-

child did not need anything, but that Mother could bring things if she wanted to. The failure of Foster Parents to ask for monetary support, coupled with their rebuff of Mother's inquiry about specific items needed, are part of the constellation of facts that must be considered to assess willfulness. *See In re Adoption of Kleshinski,* No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *19 (Tenn. Ct. App. May 04, 2005). Moreover, even if Mother's provision of in-kind support had become more sporadic during the four-month period preceding the filing of the termination petition, the fact that Mother had previously brought such items to her visits may be considered as part of the background to the willfulness determination. Foster Parents acknowledge that Mother had limited or no employment during the pivotal four-month period. They argue that her underemployment was voluntary, but they submitted no evidence to this effect, and the trial court made no such finding.

Under all of these circumstances, we cannot find that the evidence in the record establishes clearly and convincingly that Mother's failure to make monetary support payments during the four months preceding the filing of Foster Parents' termination constitutes "willful" abandonment of Kaleb. Accordingly, we reverse the trial court's termination of Mother's parental rights on the ground of abandonment for willful failure to provide support.

### *Failure to Visit*

Foster Parents argue that the trial court erred in declining to find that the ground of abandonment by failure to visit was shown by clear and convincing evidence in this case. They acknowledge that Mother visited Kaleb during the pivotal four-month period, but they argue that her visitation was merely token. *See* Tenn. Code Ann. § 36-1-113(g)(1), and § 36-1-102(1)(A)(i). The relevant statute defines the willful failure to visit as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." *Id.* at § 36-1-102(1)(E). Under the statute, "'token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* at § 36-1-102(1)(C).

On this issue, the trial court held that Mother had not abandoned Kaleb based on her failure to visit, because "[t]he evidence for the preceding four (4) months before the pleading was filed . . . ., [Mother] visited two (2) times in August; four (4) times in September, October and November." In another context, the trial court noted that Mother "has maintained regular visitation" with Kaleb. For these reasons, the trial court rejected Foster Parents' claim that Mother's parental rights should be terminated on this ground.

On appeal, Foster Parents point out that they placed no restrictions or limits on Mother's visitation with Kaleb, but despite the absence of restrictions, Mother visited the child for "no

more than two (2) hours a week over a period of fifty-three (53) months. She rarely, if ever, telephoned. Even the Mother's minimal weekly visitation was not consistent." Under the circumstances, they argue, Mother's visitation with Kaleb was "half-hearted" and "perfunctory," and must be categorized as "token" because they were "of such an infrequent nature or of such short duration so as to merely establish minimal or insubstantial contact with" Kaleb. Tenn. Code Ann. § 36-1-102(1)(C).

We agree with the trial court that the Foster Parents did not establish this ground for termination by clear and convincing evidence. Except in August 2009, when she visited only twice, Mother visited Kaleb regularly each week for two hours during the four months preceding the filing of the termination petition. As we have noted, she gave Kaleb a birthday party in September 2009. In October, even though Mother had just been hospitalized, she requested visitation with Kaleb for Halloween; in November she requested visitation for Thanksgiving. Mother was refused on these occasions because Foster Parents had made other plans for their family. Mother's requests to share the holidays with Kaleb indicate that she did not intend to abandon him during these months. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810-11. Furthermore, the evidence introduced at trial showed that Mother's visits with Kaleb were generally interactive. At times, she brought him toys, water games, and other activities to do while they were together. Indeed, Foster Mother testified that Mother and Kaleb played games together, painted together, and did other activities. Thus, the evidence indicates that her visits were not "perfunctory" in the sense that Mother focused on Kaleb while she was with him. *See, e.g., DCS v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003) (finding that the mother's visits with the child were perfunctory when she spent those visits applying makeup, sleeping, and arguing with the father, rather than focusing on the child).

Therefore, from our review of the record as a whole, we affirm the trial court's conclusion that this ground for termination was not established.

### Best Interest

Because we conclude that there are no grounds for terminating Mother's parental rights, we need not address whether terminating Mother's parental rights would be in the best interest of the child.[13] *See In re D.L.B.*, 118 S.W.3d 360, 368 (Tenn. 2003).

---

[13]Mother did not appeal the trial court's dismissal of her petition for visitation. Consequently, we do not address the propriety of the trial court's decision in this regard. This does not preclude Mother from again seeking visitation with Kaleb under the present circumstances.

**CONCLUSION**

The decision of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs on appeal are to be taxed to Appellees Amanda Kay D. N. and Waylon Ray N., for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE